BENJAMIN B. WAGNER
United States Attorney
HEATHER MARDEL JONES
Assistant United States Attorney
United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, California 93721
(559) 497-4000  Telephone
(559) 497-4099  Facsimile

Attorneys for the United States



IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY $94,500.00 IN U.S. CURRENCY,<br><br>APPROXIMATELY $1,800 IN U.S. CURRENCY, and<br><br>2011 TOYOTA TUNDRA CREWMAX, VIN: 5TFHY5F17BX196697, LICENSE: 554FDT,<br><br>Defendants. | 1:12-CV-00426-LJO-MJS<br><br>**ORDER REGARDING CLERK'S ISSUANCE OF WARRANT FOR ARREST OF ARTICLES *IN REM*** |

WHEREAS, a Verified Complaint for Forfeiture *In Rem* has been filed on March 22, 2012, in the United States District Court for the Eastern District of California, alleging that the defendants approximately $94,500.00 in U.S. Currency, approximately $1,800.00 in U.S. Currency, and 2011 Toyota Tundra Crewmax, VIN: 5TFHY5F17BX196697, License: 554FDT (hereafter collectively "defendant assets") are subject to forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(4) and 881(a)(6) for one or more violations of 21 U.S.C. §§ 841 *et seq.*;

And, the Court being satisfied that, based on the Verified Complaint for Forfeiture *In Rem* and the affidavit of Drug Enforcement Administration Special Agent Brent D. Coup,

1 there is probable cause to believe that the defendant assets so described constitute property
2 that are subject to forfeiture for such violation(s), and that grounds for the issuance of a
3 Warrant for Arrest of Articles *In Rem* exist, pursuant to Rule G(3)(b)(i) of the Supplemental
4 Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions;

5     IT IS HEREBY ORDERED that the Clerk for the United States District Court,
6 Eastern District of California, shall issue a Warrant for Arrest of Articles *In Rem* for the
7 defendant assets.

8 Dated: 3/29/2011

    DENNIS L. BECK
9     United States Magistrate Judge

### AFFIDAVIT OF BRENT D. COUP

I, Brent D. Coup, being first duly sworn under oath, depose and say:

1. I have been employed by the United States Drug Enforcement Administration ("DEA") as a Special Agent and have been so employed since April, 2004, and assigned to the Fresno Resident Office since October, 2004. I received sixteen weeks of training in narcotics investigations at the DEA Justice Training Center at Quantico, Virginia. I have participated in investigations of organizations trafficking in controlled substances and, among other things, have conducted or participated in surveillances, the execution of search warrants, and debriefings of informants. Through my training, education and experience, I have become familiar with the manner in which drug traffickers conduct their illicit activities.

2. I have been the case agent for, or have assisted in, several narcotics investigations which have led to the seizure of narcotics and arrests of numerous individuals. I have discussed with numerous law enforcement officers, cooperating defendants, and informants, the methods and practices used by narcotics distributors. In the past, I have testified in court in the area of narcotics.

3. Prior to my employment with the DEA, I was a Police Officer with the Olathe, Kansas Police Department for eight years. I received approximately 600 hours of formal police training from the Kansas Law Enforcement Training Center, forty (40) hours of which were related to controlled substance investigations, including: cocaine, cocaine base, methamphetamine, heroin, marijuana, and hallucinogens. The last two years of my employment with the Olathe, Kansas Police Department, I was assigned to the Kansas City District DEA Task Force.

4. In addition, I have attended numerous other types of training, related to the various aspects of narcotic investigations, which includes courses on surveillance techniques, conspiracy investigations, and search warrants. I have completed over 80 hours of various training provided by the DEA, including, but not limited to, training on identifying characteristics associated with illicit drug trafficking. This training involved the use,

1  possession, packaging, manufacturing, sale, concealment, and transportation of various
2  controlled substances.

3     5. I am familiar with investigations of drug trafficking organizations, methods of
4  importation and distribution of controlled substances, and financial investigations. I have
5  participated in numerous narcotics investigations either as a case agent or in a supporting
6  role. I have debriefed numerous defendants, informants, and witnesses who had personal
7  knowledge regarding major narcotics trafficking organizations. Additionally, I have
8  participated in many aspects of drug investigations including undercover operations,
9  physical and electronic surveillance, arrests, extensive analysis of telephone billing records
10 for telephones used by narcotics traffickers, and assisted in court ordered wiretaps. I am
11 familiar with narcotics traffickers' methods of operation including the manufacturing,
12 distribution, storage, and transportation of narcotics. I am also familiar with the collection
13 of money proceeds from narcotics sales and trafficking, and methods of money laundering
14 used to conceal the nature of the proceeds. I have been involved in investigations regarding
15 the unlawful importation, possession, and distribution of controlled substances, as well as
16 related money laundering statutes involving the proceeds of specified unlawful activities
17 and conspiracies associated with criminal narcotics, in violation Title 21, United States
18 Code. I have been the affiant of previous federal and state search warrants and have
19 testified in court in the area of narcotics.

20    6. I utilize all of the foregoing to formulate opinions. The facts set forth in this Affidavit
21 are known to me as a result of my investigation and interview with Agents and Officers who
22 are named in this Affidavit.

23    7. This affidavit is made in support of a warrant for arrest of defendants approximately
24 $94,500.00 in U.S. Currency, approximately $1,800.00 in U.S. Currency ("the defendant
25 currency"), and a 2011 Toyota Tundra Crewmax, VIN: 5TFHY5F17BX196697, License:
26 554FDT ("the defendant vehicle"). The defendant currency and defendant vehicle
27 constitute money or things of value furnished or intended to be furnished in exchange for a
28 controlled substance or listed chemical, all proceeds traceable to such an exchange, and all

Affidavit of Mark E. Putnam

moneys, negotiable instruments, and securities used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841 *et seq.*, and are therefore subject to forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(4) and 881(a)(6).

8. The facts set forth in this affidavit are known to me as a result of reviewing official reports, documents, and other evidence obtained as a result of the investigation, and through conversations with other agents and detectives who have participated in this investigation and I have determined the following:

9. On October 4, 2011, at approximately 12:02 a.m., California Highway Patrol (CHP) was traveling northbound on State Route 99 at Avenue 17 when the CHP officer observed the defendant vehicle traveling at a high rate of speed, confirmed by radar. The defendant vehicle was traveling 75 miles per hour (mph) in a 65mph zone, in violation of California Vehicle Code § 22349(a). The defendant vehicle was pulled over by a CHP unit north of Avenue 18½. The CHP officer approached the defendant vehicle and contacted the driver, Joel Rowntree (hereafter "Rowntree") and passenger, Brendan Grammer (hereafter "Grammer"). The CHP officer immediately smelled the strong odor of marijuana emitting from the defendant vehicle. The CHP officer advised Rowntree of the reason for the stop and asked for Rowntree's driver's license. Rowntree stated that he did not think he was speeding because he had set the cruise control.

10. The CHP officer separated Rowntree and Grammer, who appeared to the CHP officer to be extremely nervous. Both Rowntree and Grammer gave completely different accounts of their travel plans. When asked if there was marijuana located within the defendant vehicle, Rowntree denied that there was marijuana inside the defendant vehicle. When asked if he had consumed alcohol or drugs, Rowntree stated that he did not. The CHP officer checked Rowntree's eyes for horizontal gaze nystagmus (HGN); the CHP officer noticed the presence of HGN, indicating impairment. When asked where he was traveling, Rowntree stated that he was going to Portland, Oregon. Rowntree stated that they had gone to a funeral in Sacramento, California then had gone to a town; he could not remember the name of the town. Rowntree stated that the town was the next town and they had just

Affidavit of Mark E. Putnam

1  left. Rowntree was stuttering and stammering through this statement.

2  11. The passenger, Grammer, was identified as the owner of the defendant vehicle. The CHP officer told Grammer he could smell marijuana coming from the defendant vehicle to which Grammer responded that there was a little marijuana in the defendant vehicle, and claimed that it was "medicinal." The CHP officer asked where the medicinal marijuana was located and Grammer stated that he had already consumed it, but that there might be a little bit left. Grammer appeared to be very nervous. The CHP officer asked Grammer from where they were traveling. Grammer answered that they went to his aunt's in San Diego, California then went to a friend's house in Fresno, California. When asked if he would be surprised that his story conflicted with Rowntree's, Grammer stated that he would not be surprised and then acted confused.

12. The CHP officer stated that he believed there to be marijuana inside the defendant vehicle and asked for consent to search the defendant vehicle. Grammer denied consent to search the defendant vehicle. The CHP officer then stated that he had probable cause to search the defendant vehicle. By this time, two additional officers arrived and detained Rowntree and Grammer. The CHP officer then proceeded with a probable cause search of the defendant vehicle utilizing his narcotic detecting canine, "Franky," who gave a positive alert to the presence of narcotics at the rear of the defendant vehicle. The CHP officer was unable to unlock the camper shell of the defendant vehicle and asked Grammer for access to the rear of the vehicle. Grammer stated to the CHP officer that he needed a warrant. The CHP officer explained why he did not need a warrant. Grammer asked if he could consult with an attorney first. The CHP officer stated that Grammer could consult with an attorney but that he needed access to the bed of the truck so he would not break it. Grammer showed the CHP officer which key opened the camper shell.

13. Inside the camper shell, the CHP officer located two duffle bags and boxes containing a total of 87 one-pound bags of marijuana. Inside the vehicle, the officer located a prescription bottle containing 2.3 grams of cocaine, and a Teenage Mutant Ninja Turtles backpack containing two bags of U.S. Currency totaling $94,500 in denominations of 148

$50 bills and 871 $100 bills. The currency was packaged in the same food saver bags in which the marijuana was packaged. At this time, Grammer and Rowntree were Mirandized and both declined to speak to the CHP officer. When asked if the currency belonged to him, Grammer stated that he wanted to speak to a lawyer. Questioning was discontinued.

14. A search of Grammer's person resulted in the CHP officer locating $1,800 in U.S. Currency in denominations of four $50 bills and sixteen $100 bills in Grammer's wallet which was separated and in a different location from the smaller denominations also in Grammer's wallet. The CHP officer photographed the evidence and then secured the vehicle for transport to the Madera CHP Office.

15. Once at the Madera CHP Office, the CHP officer and his canine, Franky, conducted a controlled sniff test on the seized currency. Franky gave a positive alert to the defendant currency. The CHP officers then conducted a thorough search and inventory of the defendant vehicle and located in the bed of the defendant vehicle the three large black Northface duffle bags and two large cardboard boxes containing a total of 87 one-pound bags of marijuana, as well as three empty, brand new, Northface duffle bags, and an electronic money counter. Inside the cab of the defendant vehicle, the officers located 2.3 grams of cocaine in a prescription bottle inside the glove compartment box, a backpack containing two food saver bags with approximately $94,500 in U.S. Currency (one was open and the other sealed and vacuum packed), a small baggie of marijuana in a compartment on the passenger door, a small baggie of marijuana inside a suitcase, an additional one-pound bag of marijuana secreted behind the rear seat, Grammer's wallet with one section containing approximately $1,800 in U.S. Currency and the other section containing a $20 bill and smaller bills, and more food saver bags on the right rear floorboard. In all, 88 one-pound bags of marijuana were located within the vehicle.

16. Rowntree and Grammer were booked into the Madera County Jail on charges of possession of marijuana for sales and transportation of marijuana and cocaine. Grammer and Rowntree disclaimed ownership of the defendant currency, but each refused to sign disclaimer of ownership forms.

Affidavit of Mark E. Putnam

17. Grammer claimed that the defendant vehicle belonged to him and that it was paid off. Grammer initially stated that the defendant vehicle had been paid for by his mother, then later retracted that statement and said it was his uncle who paid for the defendant vehicle. Grammer then refused to answer any further questions without his attorney.

### October 19, 2011 Traffic Stop

18. On October 19, 2011 at about 11:32 p.m., an Oregon State Police trooper conducted a traffic stop on a Mitsubishi passenger car, bearing Maryland license plate 2EKR26, at I-5 and milepost 239 in Oregon for failure of having an operating license plate light. The occupant of the vehicle rolled down his window about an inch. The state trooper asked the occupant to roll his window down further so he could hear him. The driver rolled the window down another inch. Based on training and experience, the state trooper believed the occupant was attempting to hide the odor of narcotics. The state trooper noticed the occupant was sweating profusely. In the backseat of the vehicle, the state trooper observed a large black hockey bag which spanned almost the entire backseat and that the bag appeared to be full. A button-up t-shirt was draped over part of the hockey bag, which appeared to be an attempt to conceal the hockey bag. Based on training and experience, the state trooper believes hockey bags to be commonly used to carry large quantities of marijuana. The state trooper further observed two energy drinks in the center console, a GPS device in the front window, and an air freshener hanging from the rear view mirror.

19. The state trooper explained the reason for the stop and while doing so, noticed the odor of marijuana and air freshener emitting from the vehicle. The driver identified himself with a driver's license, as Joel Scott Rowntree (hereafter "Rowntree"), and stated that the car did not belong to him. Rowntree handed the state trooper a handwritten sales receipt showing that a person sold the vehicle to "Brendan Grammer" for $8,000 on October 18, 2011. Rowntree explained that Grammer was driving another vehicle and that he and Grammer were traveling together northbound. A check of Rowntree's license showed that he was a medical marijuana card holder. When asked about the medical marijuana card, Rowntree stated that he has a card but only to grow marijuana for one patient and did not

1  have a patient card for himself. Rowntree stated that he did not smoke marijuana and
2  denied that any marijuana was in the vehicle. When Rowntree provided this information,
3  he looked down and away from the state trooper. Rowntree did not present a medical
4  marijuana card nor did he have one in his possession. Rowntree was then asked to step out
5  of his vehicle to speak with the state trooper by the trooper's marked unit.

6  20. When asked about the black hockey bag located on the backseat, Rowntree stated
7  that he had dirty laundry in the bag. After being asked further about the hockey bag,
8  Rowntree stated that the bag did not belong to him, that he did not know what was inside
9  the bag, and that he did not look inside the bag. Rowntree stated that he did not look
10 inside the trunk either. Rowntree then said that the only items that belonged to him were
11 the items located on the front seat (a phone, house keys, and a cell phone charger).
12 Rowntree stated that he only got into the vehicle and started driving. When asked for
13 consent to search the vehicle, Rowntree denied consent.

14 21. An additional state trooper and his narcotic detecting canine conducted an exterior
15 search sniff of the vehicle. The canine alerted to the car. Rowntree was then handcuffed
16 and read his Miranda rights. Rowntree acknowledged that he understood his rights.
17 During this time, the vehicle alarm activated and armed itself, locking the keys inside the
18 vehicle. When asked if this was done intentionally, Rowntree stated that he did not know
19 the car would lock itself and said that he did not intend to lock the keys inside. Rowntree
20 suggested that the window be broken to gain access to the car. The state troopers contacted
21 a locksmith who arrived and unlocked the vehicle. When the vehicle was tested, it was
22 determined that the car did lock and arm itself.

23 22. A search of the Mitsubishi resulted in state troopers locating about 90 pounds of
24 marijuana inside the black hockey bag.

### Interview of Joel Scott Rowntree

26 23. On or about October 20, 2011 at about 3:00 a.m., Oregon State Police interviewed
27 Rowntree who admitted to being part of a small drug trafficking organization consisting of
28 five or six individuals. Rowntree stated that he has driven to California and has done this

same type of trip of transporting large amounts of marijuana, about six times. Rowntree stated that the cash gathered by Grammer is taken south. Rowntree explained that marijuana is gathered and purchased for about $1,000 per pound and taken back north to Grammer's residence located at 2768 SE 87th Avenue, Unit B, in Portland, Oregon where the marijuana is stored until it can be taken in a large shipment to Minneapolis, Minnesota where he and Grammer sell the marijuana for about $3,000 per pound. Rowntree stated that he has delivered marijuana to Minneapolis once to a man named 'Ryan' who owns several night clubs in Minneapolis.

24. Rowntree explained that the "leader of the group" is Grammer, who is the owner the Mitsubishi. Rowntree related that on this particular trip, he and Grammer and another male individual drove down to California with about $80,000 of Grammer's money and purchased the Mitsubishi and the marijuana. Rowntree stated that they were driving a Mini Cooper passenger car which also belonged to Grammer. Rowntree stated that they had picked up marijuana in the Sacramento, California area. Rowntree was dropped off at a store and the Mitsubishi was taken away. When the car returned it had a large hockey bag in the backseat which Rowntree knew was marijuana. Rowntree drove the car north on I-5 while Grammer and the unknown male drove north as well, somewhat together. Rowntree stated that he usually gets paid "a few grand" (ie: a few thousand dollars) to drive but that he has not yet been paid for this trip. Rowntree stated that they were driving to Grammer's residence located at 2768 SE 87th Avenue, Unit B, in Portland, Oregon.

25. Rowntree stated that Grammer has a medical marijuana grow site at his residence located in the garage. Rowntree stated that there is a large black safe in the marijuana grow room where Grammer keeps his money. Rowntree estimated that at times, Grammer has had about $100,000 in the safe. Rowntree further stated that Grammer has two shotguns. Rowntree confirmed that he has seen all of these things and further stated that he was at Grammer's residence about one week ago.

26. Law enforcement then searched Rowntree's vehicle and located a GPS system within the vehicle. Rowntree stated that Grammer had given him the GPS, but that it

really belonged to Grammer. According to the GPS, Rowntree was heading to 2768 SE 87th, Portland, Oregon. Rowntree stated that he was taking the marijuana to Grammer's residence and from there, the marijuana would be taken to Minneapolis.

27. Law enforcement located a cell phone in Rowntree's vehicle. Rowntree gave permission for law enforcement to look through the phone. In the cell phone contacts law enforcement located a phone number for "Brendan" of 971-266-9453. Rowntree stated that the number was Grammer's number. Law enforcement also located a text message from Grammer to Rowntree asking "Mini or Ford." Rowntree explained that Grammer has a Ford Explorer and a Mini Cooper.

28. While speaking with Rowntree, Oregon law enforcement learned that Grammer was previously stopped by CHP on October 5, 2011 and arrested with 88 pounds of marijuana and about $96,300 in cash. Rowntree stated that the money and marijuana belonged to Grammer.

29. Oregon law enforcement contacted CHP concerning the October 5, 2011 stop and confirmed the details of the stop, arrest, and seizure of cash and marijuana.

### Execution of Search Warrant at 2768 SE 87th, Unit B, Portland, Oregon

30. On October 20, 2011, members of the High Intensity Drug Trafficking Area Interdiction Taskforce knocked on the door to 2768 SE 87th, Unit B, Portland, Oregon residence. An agent spoke with Grammer who denied consent to search the residence. The residence was secured for execution of a search warrant. Trixie Sugay was present in the residence who told law enforcement that she and Grammer lived at Unit B, and that Rowntree lived next door at 2768 SE 87th, Unit C. Search warrants were drafted and issued for both residences and two of the vehicles owned by Grammer.

31. During the search, law enforcement located drug ledgers showing cash in amounts of about $300,000, a similar hockey bag seized during traffic stop, two shotguns, two pistols, miscellaneous paperwork from Minnesota, stolen vehicle parts, two blackberry phones, and an Apple iPad.

32. During a search of Grammer's residence, Grammer stated that he buys and sells

Affidavit of Mark E. Putnam

1 cars for a living and that in 2011, he purchased four cars and sold two. He further stated
2 that in 2010 he sold one car and assisted as an "onion broker." Grammer explained that a
3 lot of onions are grown in The Dalles, Oregon and he spent a lot of time there speaking with
4 the onion farmers and distribution warehouses. Grammer stated that The Dalles is three
5 hours away from Portland. Grammer stated that he was also in Bybee, Washington doing
6 the same business. The law enforcement agent interviewing Grammer told him that there
7 were no onion farms in The Dalles. Grammer retorted that he was telling the truth. The
8 agent again stated that there are no onion farms in The Dalles and Grammer then stated
9 that he must have been thinking of a different town.

10   33. Grammer stated that he had taken Rowntree to California to help him drive the
11 Mitsubishi he had purchased back to Oregon. Grammer would not answer specific
12 questions regarding the transportation of marijuana. The interviewing agent told
13 Grammer that law enforcement was aware that Grammer and Rowntree were involved in
14 the transportation of marijuana from California to Oregon and then to Minneapolis.
15 Grammer denied any involvement and stated that Rowntree was involved, but that he was
16 not. Grammer stated that when he purchased the Mitsubishi, there was no marijuana in
17 the vehicle. Grammer stated that there was a short time when Rowntree and the vehicle
18 were gone and that he believes that is when Rowntree picked up the marijuana. Grammer
19 stated that he returned to his residence at about 1:00 a.m. or 2:00 a.m. At this point
20 Grammer stated the he wanted to talk to a lawyer. Upon conclusion of the search,
21 Grammer was transported and booked into the Multnomah County Jail, Oregon.

### Interview of Trixie Sugay

23   34. Trixie Sugay (hereafter "Sugay") stated that she and Grammer lived together.
24 Sugay works for ODS Health Insurance and makes $2,500 to $3,000 per month. Sugay
25 stated that she banks at US Bank and has about $1,000 in her account. Sugay has a closed
26 Wells Fargo account and gave an accounting of her monthly expenses: $1,100 for rent, $500
27 for electricity (both units, Grammer's and Rowntree's), $150 for insurance, $50 for gas, and
28 $200 for food. When asked why she was paying the electricity for Rowntree's unit, Sugay

could not explain why and denied having any knowledge of Grammer and Rowntree transporting marijuana.

### Execution of Search Warrant at 2768 SE 87th, Unit C, Portland, Oregon

35. On October 20, 2011, members of the High Intensity Drug Trafficking Area Interdiction Taskforce executed a search warrant at 2768 SE 87th, Unit C, the residence of Rowntree. Within the residence, law enforcement located ten 3-foot to 4-foot marijuana plants and miscellaneous paperwork from Minnesota.

36. On the evening of October 20, 2011, law enforcement received a phone call from Shellie Grammer, who identified herself as the mother of Grammer. Shellie Grammer apologized for taking the Ford Utility vehicle and stated that she did not realize that police wanted to search the vehicle. Shellie Grammer stated that she would meet with law enforcement and stated that there was nothing inside the Ford vehicle. Shellie Grammer also stated that she had given Grammer $1,000 because he had no money.

37. On January 23, 2012, Rowntree pled guilty to Delivery of Marijuana: Substantial Quantity, in *The State of Oregon v. Joel Scott Rowntree*, Marion County Circuit Court of Oregon Case No. 11C48553, and was sentenced to 23 months' incarceration.

38. According to Oregon employment records, Grammer has no reported income since 2009. There is no record of employment, historical or current, for Rowntree.

39. On December 23, 2011, Brendan Grammer filed a claim to the defendant currency and defendant vehicle alleging that the defendant currency and defendant vehicle are his personal property and not subject to forfeiture. On December 27, 2011, Shellie Marie Grammer filed a claim to the defendant vehicle indicating that it is her personal property and not subject to forfeiture.

40. Based on the evidence presented in this affidavit, it is my opinion that the currency and vehicle described in this Affidavit are proceeds from criminal offenses or used to facilitate such criminal offenses, as described with more particularity above.

41. Based on the above, I believe there is probable cause to indicate that the defendant currency and defendant vehicle constitutes money or a thing of value furnished or intended

1 | to be furnished in exchange for a controlled substance or listed chemical, all proceeds
2 | traceable to such an exchange, and all moneys, negotiable instruments, and securities used
3 | or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841 *et seq.*, are
4 | therefore subject to forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(4) and
5 | 881(a)(6), and that a Warrant for Arrest of Articles *In Rem*, pursuant to the Supplemental
6 | Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions Rule G(3)(b)(i), be
7 | issued for the defendant currency and defendant vehicle.

BRENT D. COUP
Special Agent
Drug Enforcement Administration

Sworn to and Subscribed before me this 29th day of March 2012.

Honorable Dennis L. Beck
United States Magistrate Judge

Reviewed and approved as to form

Heather Mardel Jones
Assistant U.S. Attorney

Affidavit of Mark E. Putnam